UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-21262-CIV-HUCK/BANDSTRA

CAMILA MARIA SILVA-HERNANDEZ
A# 203-151-479,

      Plaintiff,

v.

LINDA SWACINA, Director, Miami Office,
U.S. Citizenship and Immigration Services;
ERIC HOLDER, U.S. Attorney General;
JANET NAPOLITANO, Secretary of
Homeland Security; ALEJANDRO
MAYORKAS, Director, U.S. Citizenship
and Immigration Services; ROBERT COWAN,
Director, National Benefits Center, U.S.
Citizenship and Immigration Services,

      Defendants.

_____/

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;**
**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

THIS MATTER is before the Court on Plaintiff's Motion for Summary Judgment (D.E. # 19), filed July 13, 2011, and Defendants' Motion for Summary Judgment (D.E. # 22), filed July 29, 2011. The Court has carefully reviewed the parties' submissions and is otherwise duly advised in the premises. For the reasons discussed below, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.

## I.    BACKGROUND

The material facts in this matter are undisputed. Plaintiff, Camila Maria Silva-Hernandez is a native and citizen of Brazil who entered the United States on or about December 20, 2001 as a B-2 non-immigrant visitor for pleasure. Mrs. Hernandez remained in the United States after the expiration of the visa. On August 27, 2010, she married Eduardo Hernandez, a Cuban native and

permanent resident of the United States.   On October 5, 2010, Mrs. Hernandez filed a I-485 application for adjustment of status.  This application was made pursuant to Section 1 of the Cuban Adjustment Act ("CAA") which authorizes the non-Cuban spouse of a Cuban native to apply for adjustment of status.  *See* Cuban Adjustment Act, Pub. L. No. 89-732, 80 Stat. 1161 (codified as amended at 8 U.S.C. § 1255 note).  On February 10, 2011, Defendant, United States Citizenship and Immigration Service ("USCIS") approved Mrs. Hernandez's application for adjustment of status.

The USCIS recorded Mrs. Hernandez as a legal permanent resident of the United States as of August 27, 2010, the date of her qualifying marriage under the CAA.  The CAA contains a rollback provision whereby successful applicants are recorded a date of lawful permanent residence that is the latter of thirty months prior to the filing of the application for adjustment of status, or the date of the applicant's arrival into the United States.  However, it has been USCIS policy since the enactment of the CAA in 1966 not to accord a rollback date to a non-Cuban spouses that predates the qualifying marriage.[1]

Mrs. Hernandez contends that the USCIS' assignment of her rollback date is a final agency

---

[1] Although this has been USCIS policy since the enactment of the CAA in 1966, it was memorialized in 2004 in the USCIS Adjudicator's Field Manual ("AFM").  The relevant sections of the AFM provide:

(e)     The adjustment of the spouse or child cannot precede the adjustment of the principal applicant; the adjustment must be completed at the same time as, or subsequent to, the principal's adjustment.  *Matter of Coto*, 13 I. & N. 740 (BIA 1971). In addition, the qualifying relationship may have been created before or after the principal's adjustment.  *Matter of Milian*, 13 I. & N. 480 (A.R.C. 1970).

(m)(2)  The non-Cuban spouse and children of a qualifying Cuban applicant are entitled to the same rollback provisions as the principal alien.  However, their rollback date cannot precede the date of the qualifying marriage. Although this rule has been adopted as a matter of policy, it has no basis in statute or regulation.

AFM §§ 32.11(e), (m)(2).  *See also* Marmar Decl. (D.E. # 24-1), at 3 (stating that this has been USCIS policy since enactment of the CAA in 1966).

action that is arbitrary, capricious, or not otherwise in accordance with law.[2]  Mrs. Hernandez argues that the USCIS misapplied Section 1 of the CAA by improperly calculating the retroactive date of her permanent residence.  Mrs. Hernandez contends that the plain language of the CAA requires that the rollback provision be applied in the same manner to both Cuban nationals and non-Cuban spouses.  Mrs. Hernandez argues that she is therefore entitled to have her record indicate that she has been a lawful permanent resident of the United States since April 5, 2008, the date thirty months prior to her application for adjustment of status.  This would result in establishing Mrs. Hernandez's date of adjustment almost two and a half years before she married Mr. Hernandez.

Mrs. Hernandez is asking that the Court; (1) declare that the USCIS policy of not applying the CAA's rollback provision to non-Cuban spouses in the same manner as Cuban natives violates the plain language of the CAA; (2) declare that the USCIS' assignment of her date of lawful permanent residency is arbitrary, capricious, or not in accordance with law; (3) issue a writ of mandamus compelling USCIS to adjust her record to indicate that she has been a legal permanent resident of the United States since April 5, 2008; (4) issue an injunction barring USCIS from enforcing the policy contained in AFM §§ 32.11(e), (m)(2); and (5) grant attorneys fees and costs.[3]  Both Mrs. Hernandez and the USCIS filed Motions for Summary Judgment.

## II.   ANALYSIS

### A.   Standard of Review

Summary judgment is appropriate when the pleadings, depositions, and affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue is

---

[2] The parties have stipulated that the USCIS' approval of Mrs. Hernandez's adjustment of status and the assignment of her rollback date is a final agency action within the meaning of the Administrative Procedure Act and that all administrative remedies have been exhausted.

[3] Mrs. Hernandez is seeking relief under to 8 U.S.C. § 1329 (federal court jurisdiction), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. § 2201 *et seq.* (Declaratory Judgment Act), and 5 U.S.C. § 701 *et seq.* (Administrative Procedure Act).

"material" if it is a legal element of the claim under applicable substantive law, and might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if a rational trier of fact may find for the non-moving party based on the record taken as a whole. *Allen*, 121 F.3d at 646. In determining whether summary judgment is appropriate, facts and inferences from the record are viewed in the light most favorable to the non-moving party. *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009); *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1374 (11th Cir. 1996). When evaluating cross-motions for summary judgment, as here, the Court analyzes each motion on its own merits and views the facts in each motion in the light most favorable to the respective non-movant. *Adega v. State Farm Fire & Cas. Ins. Co.*, No. 07-20696, 2009 WL 3387689, *3 (S.D. Fla. Oct. 16, 2009).

The movant bears the initial responsibility of informing the Court of the basis for its motion, and the particular parts of the record demonstrating that no genuine issue as to a material fact exists. Fed. R. Civ. P. 56(c)(1)(A). The opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Celotex*, 477 U.S. at 322. If the non-moving party fails to make a sufficient showing on an essential element of the case, or proffers only conclusory allegations, conjecture, or evidence that is merely colorable and not significantly probative, the moving party is entitled to summary judgment. *Id.*

### B.    Judicial Review of Agency Action

The Court may set aside a final decision of an administrative agency if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a); *Miccosukee Tribe of Indians of Florida*, 566 F.3d 1257, 1264 (11th Cir. 2009). It is not within the purview of the reviewing court to "conduct its own investigation and substitute its own judgments for the administrative agency's decision" if that decision was reasonable in its conclusions. *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996). In reviewing an agency's interpretation of a statute, the Court is faced with two questions. The first question is whether Congress has directly spoken to the precise issue in question. If the intent of Congress is unambiguous and clear, the Court, as well as the agency, must

give effect to that intent.  *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  However, if the statute is silent or ambiguous as to a specific issue, the Court must then determine whether the agency's decision is based on a permissible construction of the statute. *Id.* at 843.  A court may look to evidence of legislative intent beyond the language of a statute if "(1) the statute's language is ambiguous; (2) applying it according to its plain meaning would lead to an absurd result; or (3) there is clear evidence of contrary legislative intent."  *Moore v. Am. Fed'n of Television & Radio Artists*, 216 F.3d 1236, 1244 (11th Cir. 2000), *cert. denied*, 533 U.S. 950 (2001); *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999).

Mrs. Hernandez argues that the assignment of her rollback date was arbitrary and capricious because the plain language of the CAA requires the Attorney General to calculate her rollback date in the same manner as a Cuban native.  She bases her argument on three grounds.  First, Mrs. Hernandez argues that the statutory language of the CAA is unambiguous, and that Congress left no regulatory gap for the USCIS to fill with its own interpretation of the statute.  Second, Mrs. Hernandez argues that the legislative intent underlying the CAA supports a plain meaning interpretation of the statutory language.  Third, Mrs. Hernandez argues that the AFM is invalid because the USCIS violated the APA by forgoing notice-and-comment rulemaking.

The USCIS contends that its policy of not assigning a rollback date to non-Cuban spouses that precedes the qualifying marriage is based on a permissible agency interpretation of the CAA. The USCIS offers four arguments in support of its position.  First, the USCIS argues that the CAA is ambiguous as to whether Congress intended the rollback provision to apply in exactly the same manner to non-Cuban spouses and Cuban natives.  Second, the USCIS argues that a literal application of the CAA would lead to absurd results.  Third, the USCIS argues that the legislative history of the CAA indicates that Congress intended the CAA to apply to spouses only to promote family unity, and that the AFM meets that goal.  The USCIS maintains that Congress did not intend to provide a rollback date to a non-Cuban spouse that predates the qualifying marriage.  Fourth, the USCIS argues that the AFM is entitled to deference as it was promulgated pursuant to a specific grant of discretion and does not have the force and effect of law.

### 1.    *Plain Language of the CAA*

The starting point for any statutory interpretation is the language of the statute itself.  Section 1 of the CAA contains three key provisions.  First, Section 1 outlines eligibility criteria for applicants seeking adjustment of status.  It authorizes the Attorney General,[4] at "his discretion and under such regulations as he may prescribe" to adjust the status of any native or citizen of Cuba who: (1) "has been inspected and admitted or paroled into the United States subsequent to January 1, 1959," (2) "has been physically present in the United States for at least one year," and (3) "is eligible to receive an immigrant visa and is admissible to the United States for permanent residence."  CAA § 1 (8 U.S.C. § 1255(a) note).  Second, Section 1 delineates the date at which an applicant's date of lawful permanent residence is recorded.  The section reads that "[u]pon approval of such an application for adjustment of status, the Attorney General shall create a record of the alien's admission for permanent residence as of a date thirty months prior to the filing of such an application or the date of his last arrival into the United States, whichever date is later."  *Id.*  This rollback provision was also codified at 8 C.F.R. § 245.2(a)(5)(iii) (stating "Under the Act of November 2, 1966.  If the application is approved, the applicant's permanent residence shall be recorded in accordance with the provisions of section 1.").  Third, Section 1 makes non-Cuban spouses and children eligible for adjustment of status upon a qualifying marriage to a Cuban native.  This spousal provision states that "[t]he provisions of this Act shall be applicable to the spouse and child of any alien described in this subsection, regardless of their citizenship and place of birth, who are residing with such alien in the United States."  CAA § 1.

Mrs. Hernandez argues that the plain language of Section divests the Attorney General of discretion to assign a different rollback date to non-Cuban spouses than Cuban natives.  Mrs. Hernandez argues that the language, "the provisions of this Act *shall* be applicable to the spouse," requires that the rollback provision apply to Cuban natives and non-Cuban spouses the same manner.

---

[4]  After the attacks of September 11, 2001, Congress created the Department of Homeland Security and transferred the authority to adjudicate applications for adjustment of status to the Secretary of Homeland Security and the USCIS.  *See* 6 U.S.C. §§ 271(b)(5), 557.  Much of the existing case law, however, refers to the authority of the Attorney General, and, for ease and consistency, the Court also refers to the authority and discretion of the Attorney General under the relevant immigration statutes and regulations.

This language, according to Mrs. Hernandez, is clear and unambiguous.  Moreover, she argues that the legislative history of the CAA supports a plain meaning application of Section 1.  As such, she contends that the USCIS and the Court are bound to give literal effect to this language.

The USCIS argues that the CAA is a specific grant of discretionary authority to the Attorney General to adjust the status of Cubans who could not meet the requirements of other immigration statutes.  It contends that although the language of Section 1 states that "this Act *shall* be applicable to the spouse," Congress never intended to create a mandatory obligation of the Attorney General, to provide a non-Cuban spouse an adjustment date that precedes that of the qualifying marriage.

Section 1 does not contain explicit language stating that non-Cuban spouses are entitled to benefits arising prior to the date of the qualifying marriage.  Moreover, the statute presupposes the existence of a marital relationship.  The Court is therefore confronted with a statutory ambiguity; whether Congress intended to vest the Attorney General with the discretionary authority over the entire process of adjustment of status under the CAA, or whether Congress intended to divest the attorney general of discretion to assign a non-Cuban spouse a rollback date other than either thirty months prior to filing a I-485 application or the date of entry.  The Court must therefore turn to the legislative history of the CAA to determine whether Congress has spoken directly on this issue.

### 2.    *Legislative History*

To determine whether Congress has spoken to the direct issue at hand under the first step of *Chevron*, the Court looks to the legislative history of the statute.  *See Miccosukee Tribe*, 566 F.3d at 1273-74 (noting that legislative history materials have been used by the Eleventh Circuit and Supreme Court to decide whether congressional intent is clear under the first step of *Chevron*); *Guar. Fin. Servs., Inc. v. Ryan*, 928 F.2d 994, 1004 (11th Cir. 1991) ("in order to determine whether Congress has directly addressed the precise question at issue, we have undertaken an analysis of the available legislative history") (internal citations omitted).  When reviewing the legislative history of enacted legislation, official congressional reports are an authoritative source for the Court to consider.  *Miccosukee Tribe*, 566 F.3d at 1274 (citing *Ryan*, 928 F.2d at 1004).

Mrs. Hernandez contends that the legislative history evinces a congressional intent to "give Cuban aliens, their spouses, and children an advantage (*i.e.*, a "head-start") towards qualifying for naturalization."  Pl. Mot. Summ. J. at 8.  She argues that the intent of Congress was to accord non-Cuban spouses with exactly the same benefits under the CAA as Cuban natives.  By contrast, the USCIS contends that Congress intended the CAA's spousal provision to be a means to promote family unity by making non-Cuban spouses, once married to a Cuban national, eligible for adjustment of status.  The USCIS argues that Congress did not intend to give non-Cuban spouses retroactive application of benefits that predate the qualifying marriage.  For the reasons discussed below, the Court finds that the legislative history of the CAA does not show an intent to provide a non-Cuban spouse a record date of lawful permanent residence prior to the date of the qualifying marriage.

Congress enacted the CAA in 1966 to address the plight of Cubans fleeing Castro's regime and who could not otherwise easily meet the requirements of American immigration laws.[5]  The legislative record does not indicate a congressional intent to confer benefits on other, non-Cuban immigrants.  Congress did not incorporate other proposals that would have extended the scope of the legislation to aliens immigrating from any country in the Western Hemisphere.[6]  Throughout the

---

[5]  Prior to the enactment of the CAA, a Cuban refugee was required to meet the requirements of Section 245(a) of the Immigration and Nationality Act (8 U.S.C. § 1255(a)).  This would have required a Cuban refugee seeking to become a lawful permanent resident to leave the United States to secure an immigrant visa at a U.S. consular office abroad, and then reenter as a permanent resident.  The CAA was intended to alleviate the administrative burden on U.S. consular offices and the financial burdens on Cuban refugees, many of whom fled Cuba with little financial resources. *See* H.R. Rep. No. 89-1978, at 3 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3792, 3794 (stating that the CAA was intended to "reduce the government's expenditures on behalf of the Cuban refugees and will aid in their resettlement by enhancing their opportunity to qualify for employment in all areas of the nation"); *To Adjust the Immigration Status of Cuban Refugees in the United States: Hearing on S. 1242 and S. 3712 Before the S. Comm. on the Judiciary*, 89th Cong. 12 (1966) (statement of Lincoln Gordon, Assistant Secretary of State for American Affairs) (describing the previous process by which Cuban immigrants obtained permanent residence).

[6]  Deputy Attorney General Ramsey Clark noted that there was competing legislation proposed to authorized the adjustment of status for any alien in the Western Hemisphere.  *See Adjustment of Status for Cuban Refugees: Hearings on H.R. 15182, H.R. 15183, H.R. 16908, H.R. 10808, and H.R. 13393 Before Subcommittee No. 1 of the Committee on the Judiciary House of Representatives*, 89th Cong. 7 (1966) (statement of Ramsey Clark).  *See also To Adjust the Status of Cuban Refugees in*

legislative history, the drafters reiterated that Cuban refugees were the beneficiaries of the legislation.

The legislative history of the spousal provision in Section 1 of the CAA indicates that Congress inserted that provision to promote family unity. *See Gonzalez v. McNary*, 980 F.2d 1418, 1421 (11th Cir. 1993) ("The purpose of the Act's provision permitting a spouse and child of a Cuban alien to obtain residence is to promote family unity."). In his testimony, Deputy Attorney General Ramsey Clark noted that to "maintain unity of the family, it is suggested that the bill be revised to provide for the adjustment of status thereunder of the spouse and children of the Cuban who is the principal beneficiary of this bill." H.R. Rep. No. 89-1978, at 8 (1966) (statement of Ramsey Clark, Deputy Attorney General), *reprinted in* 1966 U.S.C.C.A.N. 3792, 3799. To effect that intent, the Deputy Attorney General recommended that the language "The provisions of this Act shall be applicable to the spouse and child of any alien described in this subsection, regardless of their citizenship and place of birth, who are residing with such alien in the United States" be added. The legislative history does not evince an congressional intent to accord non-Cuban spouses the exact same benefits as Cuban natives. Rather, the language seems intended to support family unity by conferring eligibility for adjustment of status to non-Cuban spouses based on their marriage, not to accord non-Cuban spouses with a record date of lawful permanent residence prior to the date of the qualifying marriage.

### 3.     *A Literal Application of the CAA Leads to Absurd Results*

The USCIS also contends that a literal application of the rollback provision under the plain language of the CAA would "yield[] a result that is both absurd and completely at odds with the entire statutory context in which the language is found." Def. Mot. Summ. J. at 17-18. The USCIS offers several hypothetical situations in support of this contention. Under the literal interpretation of the statute promoted by Mrs. Hernandez, the USCIS points out that a non-Cuban spouse could receive an adjustment date earlier than the Cuban native upon whom the spouse's application is

---

*the United States: Hearing on S. 1241 and S. 3712 Before the Subcommittee on Immigration and Naturalization of the Senate Committee on the Judiciary*, 89th Cong. 22 (statement of Senator Hart) ("let us limit this legislation to Cubans only").

based.  It is also possible, notes the USCIS, that a non-Cuban spouse could become a lawfully adjusted permanent resident before the qualifying marital relationship was formed.  The non-Cuban spouse would then be eligible for naturalization prior to the Cuban spouse.  Step-children could similarly be recorded as lawful permanent residents prior to the formation of the step-relationship.  The government also offers a situation where the non-Cuban spouse could be recorded as a lawful permanent resident prior to the Cuban native's entry into the United States.  As such, the USCIS argues that a literal application of the plain language of the CAA is absurd because it would accord the non-Cuban spouse naturalization benefits greater than that of the Cuban native.

Mrs. Hernandez responds that a literal application of the CAA would not lead to absurd results.  Mrs. Hernandez contends that the legislative history of the CAA indicates that the rollback provision was intended to "provide the beneficiaries of the CAA a 'head start' with respect to eligibility for naturalization."  Pl. Mot. Summ J. at 15.  Mrs. Hernandez argues that once the non-Cuban spouse meets the CAA's eligibility criteria, "[i]t makes common sense to extend the same head start towards naturalization to the non-Cuban spouse or child, as is extended to the Cuban national."  *Id.* at 16.  Mrs. Hernandez argues that a non-Cuban spouse or child would not qualify for naturalization until years after the Cuban native.  This result would, in her view, be absurd in light of the legislative intent of the statute.

The Court may reach a result seemingly inconsistent with the plain meaning of a statute "if giving the words of a statute their plain meaning produces a result that is not just unwise but is clearly absurd."  *Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011); *Moore*, 216 F.3d at 1244.  In the instant case the Court finds that a literal application of the CAA's spousal and rollback provisions, as Mrs. Hernandez suggests, would yield results that are absurd in light of their legislative intent.  The rollback provision was intended to permit Cuban refugees, as the beneficiaries of the CAA, to reduce the waiting period prior to becoming eligible nationalization.  Congress did not indicate that the rollback provision was intended to confer benefits on non-Cuban refugees except as interpreted by the USCIS.

Moreover, as discussed above, the spousal provision was inserted in the CAA to promote family unity.  Mrs. Hernandez would have the Court believe that recording a non-Cuban spouse's date of lawful permanent residence prior to the qualifying marriage or the Cuban spouse's entry into

the United States serves that end.  The Court disagrees.  A literal application of the plain language of the CAA produces results that are absurd in light of the legislative intent of the CAA.

### C.    The Assignment of the Rollback Date was not Arbitrary or Capricious

The Court must now determine whether the USCIS' decision is based on a permissible construction of the statute.  *Chevron*, 467 U.S. at 843.  An agency action may be set aside under the arbitrary and capricious standard if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Miccosukee Tribe*, 566 F.3d at 1264 (quoting *Alabama-Tombigbee Rivers Coalition v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007)).

Agency interpretations that lack the force of law such as those in opinion letters, agency manuals, and other formats that are not a product of notice-and-comment rulemaking or formal adjudication are "entitled to respect."  *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  "The weight of such a judgment in a particular case will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control." *Gonzalez v. Oregon*, 546 U.S. 243, 268 (2006) (quoting *Skidmore*, 323 U.S. at 140).

### 1.    The AFM is based on a Permissible Interpretation of the Statute

The AFM is a based on a permissible construction of the CAA in light of the language of Section 1 and its legislative history.  As mentioned above, Congress enacted the rollback provision to assist Cubans to more easily and quickly meet residency requirements, and the spousal provision to promote family unity by making non-Cuban spouses eligible for adjustment of status.  The policy of assigning non-Cuban spouses a record date to that of their qualifying marriage is consistent with the intent of Congress in enacting the CAA.

The AFM is also consistent with earlier agency pronouncements.  In *Matter of Riva*, the

Board of Immigration Appeals found that Congress intended the rollback provision to "provide Cuban aliens who had been inspected and admitted or paroled into the United States after January 1, 1959 and who had resided for some time within the United States, with a partial assist toward meeting the residence requirement for naturalization." *Matter of Riva*, 12 I. & N. Dec. 56, 58 (BIA Reg. Comm'r 1967). Similarly, in *Matter of Carrillo-Gutierrez*, the Board of Immigration Appeals found that Congress enacted the rollback to "provide certain Cuban aliens with a head start toward meeting the residence requirement for naturalization." *Matter of Carrillo-Gutierrez*, 16 I. & N. Dec. 429, 430 (BIA 1977). The Board noted that the "retroactive provision was designed merely as a means of allowing beneficiaries of the legislation to count some time spent in the United States . . . towards their residence requirement for naturalization." *Id.* Both of these decisions are consistent with the USCIS' view that Congress intended the rollback provision to apply to only Cuban aliens who are the beneficiaries of the legislation.

### 2.     *The AFM is Entitled to Deference*

Mrs. Hernandez argues that the AFM was promulgated in violation of the APA and is therefore invalid and not subject to judicial deference. She argues that the AFM meets the APA definition of a "rule" because it goes beyond clarifying or explaining existing laws, and (2) creates a binding norm limiting agency discretion. Mrs. Hernandez contends that because the AFM should be considered a rule, the USCIS violated the APA because the AFM was not promulgated in accordance with the formal rulemaking procedure, including the notice-and-comment requirement. *See* 5 U.S.C. § 553 (outlining rulemaking procedures).

The USCIS argues that the AFM is valid and entitled to judicial deference for two reasons. First, the government contends that the Court should accord the AFM deference because it was promulgated pursuant to a specific statutory grant of discretionary authority. Second, the USCIS contends that the AFM is simply an agency interpretation of existing law, and does not go beyond existing law. The USCIS argues that because the AFM merely interprets existing law, it is not subject to formal notice-and-comment rulemaking. *See* 5 U.S.C. § 553(b)(A) (exempting "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from notice-and-comment rulemaking).

12

The Eleventh Circuit has held that the USCIS "under authority delegated by the Attorney General, clearly has the discretion under the [CAA] to adjust the status of the spouse and children of a Cuban alien." *Valdivia v. U.S. Attorney General*, 380 Fed. App'x 793, 794-95 (11th Cir. 2010) (quoting *McNary*, 980 F.2d at 1419-20). Section 1 of the CAA states that the Attorney General may adjust the status of eligible applications under the CAA "in his discretion and under such regulations as he may prescribe." CAA § 1. Mrs. Hernandez asserts that this discretionary authority does not apply to the assignment of the rollback date because of the plain language of the CAA. However, as discussed above, the Court disagrees.

The APA defines a "rule" as an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law . . . ." 5 U.S.C. § 551(4). In determining whether an agency pronouncement is subject to formal rulemaking procedures, the Eleventh Circuit has distinguished between "substantive rules" (also termed "legislative rules") and "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *Smith v. Russellville Production Credit Ass'n*, 777 F.2d 1544, 1547-48 (11th Cir. 1985) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979)); *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009). While a substantive rule creates new law, rights, and duties, an interpretive rule conversely "'typically reflects an agency's construction of a statute that has been entrusted to the agency to administer' and does not 'modify or add to a legal norm based on the agency's own authority.'" *Warshauer*, 577 F.3d at 1337 (quoting *Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94-95 (D.C. Cir. 1997) (emphasis omitted)).

The Eleventh Circuit has set forth numerous principles that differentiate substantive and interpretive rules. The distinction between substantive and interpretative rules likely "turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute." *Id.* (quoting *Syncor*, 127 F.3d at 94. First, the Eleventh Circuit has noted that an agency's characterization of its own rule is relevant to the Court's determination of whether it is substantive or interpretative. Second, when an administrative agency states what it "thinks a statute means," it is generally properly considered an interpretive rule. *Id.* Conversely, a substantive rule exists when an agency creates new law, rights, and duties. *Id.* (citing *Citizens to Save Spencer County v. E.P.A.*, 600 F.2d 844, 876 n.153 (D.C. Cir. 1979)). Third, substantive rules "have effects *completely*

13

*independent* of the statute." *Id*. (quoting *Metro. Sch. Dist. of Wayne Twp. v. Davila,* 969 F.2d 485, 490 (7th Cir. 1992) (emphasis in original)).

In the instant case, the AFM is properly characterized as an interpretive rule.  First, the USCIS has declared that the AFM is itself a "rule has been adopted as a matter of policy."  AFM § 23.11(m)(2).  The USCIS maintains that the AFM seeks to clarify how the rollback provision in the CAA is to be applied to non-Cuban spouses in light of the statute's silence on that issue.  Second, the AFM does not create new law, rights, or duties.  There is no additional qualification imposed on non-Cuban spouses applying for adjustment of status, nor has the USCIS imposed any additional duty on Cuban or non-Cuban applicants for adjustment of status.  Rather, the AFM merely clarifies the manner in which the agency applies its own rules.  Lastly, the AFM does not create any effects that are completely independent of the statute.  The AFM is therefore an interpretative rule and exempt from notice-and-comment rulemaking.

Second, Mrs. Hernandez argues that the AFM is not exempt from notice-and-comment rulemaking because it creates a "binding norm."  Relying on *Jean v. Nelson*, 711 F.2d 1455 (11th Cir. 1983), Mrs. Hernandez asserts that because the AFM creates an "airtight rule that was not subject to notice and comment rulemaking," the USCIS violated the APA.  Pl. Mot Summ. J. at 14.  *Jean v. Nelson* is, however, materially distinguishable from the instant case.

In *Nelson*, the Eleventh Circuit considered whether a new INS policy that bypassed notice-and-comment rulemaking procedures violated the APA.  After the closure of Ellis Island in 1954, the majority of immigrant entrants were paroled into the United States pending a determination of their right of entry.  *Nelson*, 711 F.2d at 1468-69.  In 1981 the INS announced a new policy of detaining undocumented aliens pending a determination of their right of entry to meet the country's growing immigration concerns.  *Id*. at 1469-70.  This new policy was promulgated without adherence to notice-and-comment rulemaking procedures.  The Eleventh Circuit found that the policy was a rule within the meaning of the APA, and therefore required a notice-and-comment period.  The Eleventh Circuit first found that the new policy did not fit within the interpretative rule exception because it did not clarify existing laws or regulations.  *Id*. at 1478.  Rather, the court noted that "the decision to reverse a longstanding and uniform practice by revoking all outstanding authorities of a particular type and implicitly indicating that no such authorities will be issued in the future is

14

clearly a rule." *Id*. at 1476 (quoting *American Trucking Assoc. v. United States*, 688 F.2d 1337, 1348 (11th Cir. 1982)) (emphasis omitted).  The Eleventh Circuit then determined that the policy did not fit within the APA exception for general statements of policy.  *Id*. at 1478-83.  In reaching this conclusion, the Eleventh Circuit considered whether the policy created a "binding norm" by "so fill[ing] out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion."  *Id*. at 1481.

Here, unlike *Nelson*, the AFM fits squarely within the interpretative rule exception of the APA.  The AFM does not create new law, rights, or duties, nor does the AFM create any effects that are completely independent of the statute.  The USCIS has not articulated a new policy that departs from a longstanding and uniform practice.  Rather, the policy has been in effect since the enactment of the CAA in 1966.  The Court agrees with the USCIS that the AFM is an "internal guidance manual that includes different scenarios and hypothetical situations to guide adjudicators and advise them of the CAA."  Def. Opp. Resp. at 7.  Furthermore, the AFM does not divest the Attorney General of any authority granted under the CAA.  Rather, the AFM is an interpretative rule promulgated pursuant to the discretionary authority of the Attorney General on how rollback dates are assigned to non-Cuban spouses who have qualified for adjustment of status by virtue of their marriage to Cubans.  Because the AFM fits within the interpretive rule exception to the APA, the Court does not need to determine whether the general statement policy exception also applies.

The Eleventh Circuit's recent holding in *Serrano v. U.S. Attorney General* is instructive.  *Serrano v. U.S. Attorney General*, No. 10-12990, 2011 WL 4345670 (11th Cir. Sept. 16, 2011).  At issue in *Serrano* was a determination by the USCIS that the plaintiff was not eligible for adjustment of status under 8 U.S.C. § 1255(a).  The plaintiff had entered the United States illegally and subsequently registered for Temporary Protective Status.  The INS had previously issued an interpretation stating that an alien who entered the United States without inspection was ineligible for adjustment of status even though he was granted Temporary Protected Status.  *Id*. at *3.  The Eleventh Circuit held that the decision was consistent with the plain language of 8 U.S.C. § 1255(a), and that USCIS administrative interpretations were entitled to *Skidmore* deference.  *Id*. (citing *Quinchia v. U.S. Attorney General*, 552 F.3d 1255, 1259 (11th Cir. 2008).  Other courts have similarly accorded *Skidmore* deference to interpretations of immigration statutes.  *See, e.g.*, *Ortega-*

*Cervantes v. Gonzales*, 501 F.3d 1111 (9th Cir. 2007) (according a Bureau of Immigration Appeals' statutory interpretation *Skidmore* deference); *Landin-Molina v. Holder*, 580 F.3d 913 (9th Cir. 2009) (according a USCIS policy memorandum interpreting 8 U.S.C. § 1255(i) *Skidmore* deference); *Haitian Refugee Center, Inc. v. Baker*, 953 F.2d 1498 (11th Cir. 1992), *cert. denied*, 502 U.S. 1122 (1992) (holding that INS guidelines contained in a memorandum were not intended to grant substantive rights but only intended to provide INS employees guidance).  Because the AFM is an interpretative rule and was properly promulgated under the authority delegated by the Attorney General, the Court accordingly finds that it is appropriate to accord the AFM *Skidmore* deference.

## III.   <u>CONCLUSION</u>

For the reasons stated above, the Court concludes that the USCIS' assignment of Mrs. Hernandez's record date of permanent lawful residence was a final agency action that was not arbitrary, capricious, or not in accordance with law.  The policy is based on a permissible construction of the CAA in light of its statutory language and its legislative intent.  The policy is an interpretative rule that is entitled to *Skidmore* deference.  As such, the Court declines to set aside the USCIS policy of not recording non-Cuban spouses a date of lawful permanent residency that precedes the date of the qualifying marriage.  Accordingly, it is hereby

ORDERED that Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.  The Court will enter a separate order entering final judgment and closing the case.

DONE AND ORDERED in chambers, Miami, Florida, November 4, 2011.

PAUL C. HUCK
United States District Judge

<u>Copies furnished to:</u>
Counsel of Record

16